# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) | |
| v. | | 12CV7125 JUDGE CHANG MAG. JUDGE MASON |
| NIKOLAI S. BATTOO, BC CAPITAL GROUP S.A. (PANAMA), BC CAPITAL GROUP LIMITED (HONG KONG), and TRACY LEE SUNDERLAGE, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges:

1.      The SEC brings this civil law enforcement action on an emergency basis to protect U.S.-based investors whose investments are currently being held hostage by defendant Nikolai S. Battoo and entities under his control. Battoo is an alternative asset manager who claims to manage assets valued at over $1.5 billion – at least $100 million of which is managed for the benefit of American-based investors. Battoo's financial empire is an amorphous syndicate of far-flung funds, entities, and affiliates.

2.      In 2008, Battoo and his company-defendants lost tens-of-millions of dollars investing in Madoff "feeder funds." That same year they lost more than $100 million when an international bank terminated Battoo's access to its

credit and platform of funds. Yet Battoo has not been forthcoming with his investors about the extent of – or in some cases even the *fact* of – these losses. His statements to clients omit his staggering losses. In the wake of such deception, existing clients have invested fresh investment proceeds. Battoo's falsified track record of benchmark-beating returns has also won him new investors.

3.      The jig appears to be up. Clients are now clamoring for redemptions, so Battoo has doubled-down on his deception. He's blamed the MF Global calamity for his inability to repay investors. But when the SEC sought support for such claims, he declined to provide further information. At other times Battoo has blamed unnamed counterparties for freezing his assets because of unspecified government investigations. He told one investor that his attorneys were negotiating a "release" with the SEC. These statements are lies.

4.      Battoo's scheme has been furthered by defendant Tracy Lee Sunderlage - no stranger to this Court or the SEC. His previous malfeasance was the subject of a SEC enforcement action in this Court, ultimately earning him a permanent injunction by this tribunal. Thereafter, the SEC ordered a bar against Sunderlage prohibiting him from associating with any broker-dealer or investment adviser. Sadly, these measures have not deterred Sunderlage. His involvement in Battoo's scheme as an unregistered broker/dealer and as an investment adviser flagrantly violates this Court's injunction and the SEC's industry bar.

2

5.     As the first order of business in this lawsuit, the SEC asks this
Court to order Battoo to account – promptly, fully, accurately, and under oath –
for the investment proceeds that have been entrusted to him. Battoo's clients
and their investors deserve to know the current value, form, and whereabouts of
their investments. Moreover, the SEC seeks to protect the public from further
violations of the federal securities laws; to put an immediate halt to defendants'
ongoing misconduct; and to hold them accountable for their malfeasance.

## JURISDICTION AND VENUE

6.     The SEC brings this action pursuant to Section 20(b) of the
Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Sections 21(d)
and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.
§§ 78u(d) and 78u(e)], and Section 209(d) of the Investment Advisers Act of
1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].

7.     This Court has jurisdiction over this action pursuant to Section 22
of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15
U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28
U.S.C. § 1331.

8.     Venue is proper in this Court pursuant to Section 27 of the
Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business
constituting violations alleged herein have occurred within the Northern
District of Illinois and elsewhere.

9.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

10.     **Defendant Nikolai S. Battoo**, age 41, is an alternative investment manager who claims to have $1.5 billion in assets under management. Battoo is the principal of defendants BC Capital Group S.A. (Panama) and BC Capital Group Limited (Hong Kong). He manages several hedge fund families. Battoo is also the "senior advisor" for Private International Wealth Management ("PIWM"), a brand name under which he manages a number of portfolios. Battoo is a principal of FuturesOne LLC, a National Futures Association-registered commodity pool operator and commodity trading advisor located in Lincoln, Nebraska. As recently as 2009, he maintained a residence and an office in Florida, where several of his businesses continue to be incorporated.

11.     **Defendant BC Capital Group S.A. (Panama) ("BC Panama")** is incorporated under the laws of the Republic of Panama. Battoo is its principal. BC Panama serves as the umbrella company for Battoo's investment management business and the "manager and managing company" of the PIWM portfolios.

12.     **Defendant BC Capital Group Limited (Hong Kong) ("BC Hong Kong")** is incorporated under the laws of Hong Kong. Battoo is its principal.

BC Hong Kong is the "appointed financial investment advisor" for the PIWM portfolios and a party to the investment management agreements with Maven Assurance Ltd. and other entities through which U.S. residents directed funds to Battoo and his PIWM investment program.

13.     Until 2011, **defendant Tracy Lee Sunderlage**, age 65, resided in Huntley, Illinois. He now lives in Florida. In 1986 the SEC sued him in connection with his participation in an offering fraud. *See SEC v. Sunderlage, et al.*, 86 C 6101 (N.D. Ill.). The Court entered a permanent injunction enjoining him from future violations of the registration and antifraud provisions of the federal securities law. The SEC then barred him from associating with any investment adviser or broker-dealer. Although Sunderlage could have reapplied to lift the bar, he never did so. Accordingly, the SEC-imposed industry bar remains in full force and effect.

14.     Notwithstanding and in violation of this Court's order and the SEC's bar, since 2005 Sunderlage has overseen a complex investment program through Maven Assurance, Ltd. and Maven Life International (both of which are collectively referred to as "Maven" in this complaint). The program has funneled tens of millions of dollars into Battoo-managed investments. Maven is administered by Randall Administration LLC, which has an office in a Chicago suburb near where Sunderlage lived. Sunderlage received substantial fees and commissions for selling variable annuities and other securities to Maven clients, many of whom purchased such products through self-directed IRAs using U.S.-

based IRA custodians. Fully 80% to 95% of the amount paid by the Maven investors was ultimately invested in Battoo's PIWM portfolios. Sunderlage made the supposedly high return from the PIWM portfolios a key selling point for Maven products. By 2008, Battoo was managing about $70 million associated with Maven products. That amount has since grown to about $95 million.

## FACTS

### BATTOO AND HIS PIWM "CONCEPT"

15.     Battoo pitches himself as a successful asset manager with a track record of exceptional risk-adjusted returns – one unblemished by the global financial crisis of 2008. Battoo purports to employ diverse investment strategies utilizing a wide array of securities and other investment products. He manages or is the Senior Advisor for at least four hedge fund families through affiliated entities: Anchor Hedge funds, Galaxy Fund, FuturesOne Diversified funds, and Phi R (Squared) funds. Layered atop these funds sits "Private International Wealth Management" or "PIWM," a "concept" that Battoo created and oversees. PIWM essentially serves as the brand name for Battoo's asset management operation. Battoo uses the PIWM brand to disseminate newsletters and other communications to clients and prospective clients. Battoo has a representative located in Florida to assist U.S.-based PIWM clients with their investing needs. Until at least 2009, Battoo also used his residence in Florida as an office in connection with his investment management business.

16.     Battoo manages significant assets for companies that sell investment products to U.S. investors, including Maven, Acadia Life and Fidelity Insurance. The companies pool the funds of their investors and place those funds under Battoo's management.

17.     Battoo also has investment proceeds channeled to him by a network of U.S.-based investment advisers, like Florida-based Sovereign International Asset Management and Arizona-based The Planning Group. The investment proceeds are pooled and placed under Battoo's management. All told, Battoo manages at least $100 million for the benefit of U.S.-based investors.

18.     Battoo has created individualized PIWM "portfolios" for different clients consisting of holdings in his hedge funds, holdings in other hedge funds, and other investments. Maven is a good example. Maven investors who purchase an investment contract from Maven Assurance are given a choice of three PIWM-I portfolios: Portfolio A is the "conservative" portfolio, Portfolio B is the "growth" portfolio, and Portfolio C is the "aggressive growth" portfolio. Investors who purchase variable annuities through Maven Life are similarly given several PIWM-I investment options: PIWM-I Conservative, PIWM-I Market Neutral, PIWM-I Absolute Growth, and PIWM-I Absolute Aggressive Growth. All of these "PIWM-I portfolios" consist of interests in Battoo-managed hedge funds, independent hedge funds, and PIWM-I managed accounts. Maven investors currently have over $95 million invested in Battoo's

PIWM-I portfolios.

## BATTOO SUSTAINS HEAVY LOSSES IN 2008

19.    In 2008, Battoo was terminated as an investment adviser to the master fund of a large international bank, which also terminated him from a "fund linked certificate" program. The fund linked certificate program, which Battoo had joined in 2005, gave him access to various investment funds, and extended him credit to facilitate leveraged investments in such funds. Through the program, classes of Battoo-managed hedge funds collectively invested about $138 million in fund linked certificates.

20.    After an audit of Battoo's operations, in 2008 the bank decided to terminate its relationship with him and the corporate defendants. After Battoo's termination, the net asset value of the hedge fund managed for the bank plummeted by nearly 50%.  Battoo's losses on the fund linked certificates exceeded $100 million.

21.    The other major loss that Battoo's asset management business suffered flowed from Bernie Madoff. In December 2008, several Battoo-managed hedge funds were heavily invested in the Madoff Ponzi scheme. To make matters worse, Battoo borrowed money to amplify the size of his Madoff investments.

22.    The losses that Battoo incurred in the fund linked certificate investments and in the Madoff fraud flowed through to the PIWM portfolios in

which U.S. investors have significant investments.

## BATTOO HIDES THE LOSSES FROM
## INVESTORS AND PROSPECTIVE INVESTORS

23.     On December 16, 2008, following Bernie Madoff's arrest for
operating a massive Ponzi scheme, Acadia Life emailed Battoo inquiring about
"the degree, if any, of your company's involvement with Mr. Madoff's
investment company." Later that day, Battoo responded that PIWM "will be
issuing a letter by [the] end of [the] week to all clients to inform them that the
current Madoff situation will have practically no impact on its portfolios." On
the same day, Battoo also sent an email to the same effect to Maven's principal.
As promised, days later Battoo sent a PIWM newsletter to investors, including
Maven and Acadia Life, with this statement:

> Let's get straight to the point; PIWM did not have any **direct** investments with Madoff or
> any counterparty (broker or trading) exposure to Bernard L. Madoff Investment
> Securities LLC ("Madoff").
>
> PIWM did carry a small nominal percentage of approx (0.20% - 2.9%) portion of
> **indirect** exposure through a diversified hedge fund. Thus when accounted for, the impact
> will be less than (0.05% – 0.78%) depending on each client's custom-tailored portfolio
> which is very low and well under 1.0%. This shows why we focus on our diversified
> methodology across our multi-strategy and assets composites.

24.     Battoo's representations were false.  The portfolio breakdowns that
Battoo sent Acadia Life and Maven *before* the Madoff scheme became public
reflected significant investments in hedge funds that fed into the Madoff scheme
ranging from 10% to 24% in Acadia's PIWM portfolios, and about 19% for
Maven's PIWM-I "Portfolio B." Battoo never disclosed such impairments to
Acadia, Maven, or to their investors who entrusted their funds to Battoo.

25.     Moreover, Maven's two biggest PIWM portfolios had more than 20% of their assets invested in Battoo hedge funds whose *sole* investments were in the bank's fund linked certificates. Such exposure notwithstanding, Battoo never told Maven about the losses stemming from the fund linked certificates.

26.     Without knowledge of the substantial losses suffered by the portfolios as a result of the Madoff and the fund linked certificate investments, since 2009 Maven and Acadia Life investors collectively invested tens-of-millions of dollars with Battoo and his companies.

### BATTOO VISITS LAS VEGAS TO REASSURE EXISTING INVESTORS AND TO WIN NEW ONES

27.     In January 2009, Battoo traveled to Las Vegas to meet with existing and prospective investors at a "due diligence conference" that he and Sunderlage sponsored. As reflected in this promotional material for the conference, held at the Four Seasons Hotel, Sunderlage promised Maven investors that Battoo would share secrets of his success in weathering the recent financial crises:

**Market Meltdown September –November 2008, Now Madoff Fraud and its Consequences**

Today it is more important than anytime in past history to fully understand how PIWM-I manages its portfolios for its insurance dedicated funds and for Maven Assurance Ltd. three custom designed portfolios. How is it that PIWM-I can produce positive results or significantly reduce market losses when nearly everyone else is losing 35 to 50%? It is important to know and understand clearly how the funds are managed.

28.     Battoo didn't disappoint. During the conference investors asked

Battoo whether the Madoff fraud had impacted the PIWM portfolios. Battoo told them that PIWM had suffered only minimal exposure stemming from Madoff. Following the Las Vegas meeting, Maven channeled more than $33 million of fresh investment proceeds to Battoo and PIWM.

29.     During his trip, Battoo also met with prospective investors, who liked what they heard. The principals of The Planning Group, an Arizona-based investment adviser, attended the Las Vegas meeting with one of their clients. They were impressed with Battoo's presentation, and thereafter encouraged their clients to invest with him. Sixty-three of its clients ultimately did so, channeling $5 million into the PIWM "Absolute Growth" portfolio.

### BATTOO'S "SWAP" OFFER

30.     Sovereign International Asset Management, Inc. ("SIAM"), a Florida-based registered investment adviser, has a longstanding relationship with Battoo. SIAM created an affiliated entity to pool client funds for investment with Battoo. By late 2008, SIAM's affiliate had invested about $47 million in SIAM client funds into Battoo's hedge funds and PIWM portfolios. Unlike Maven, Acadia, and others who invested in Battoo's PIWM portfolios, SIAM invested directly in the Battoo hedge funds with investments in the failed fund linked certificate program. In October 2008, those impaired funds decided to suspend all redemptions.

31.     SIAM and its clients became concerned upon receiving redemption suspension notices from the funds. To address SIAM's concerns,

Battoo had an in-person meeting with SIAM's principals in Florida in late 2008. During that meeting Battoo took the dramatic step of making a "swap" offer to SIAM and its investors. Under Battoo's proposal, he would take shares of impaired hedge funds off their hands and replace them with shares in PIWM's "Market Neutral" portfolio. The "swap," he assured SIAM, would be based on the pre-impairment value of the Battoo hedge fund shares.

32.     But there was a catch. Two catches, actually. First, the SIAM clients could not seek redemptions for at least 18 months. Second, Battoo expected SIAM to raise an additional $25 million in capital for PIWM.

33.     In 2009, many SIAM clients accepted the swap offer, strings notwithstanding. However, from the time of the initial offer through the closing of the swap transaction, Battoo failed to disclose a critical fact: the PIWM "Market Neutral" portfolio had significant exposure to Madoff.  In fact, reports that Battoo provided investors and/or prospective investors *before* Madoff's fraud became public reflect that 22% of the "Market Neutral" portfolio was invested in funds that fed into the Madoff scheme.

### BATTOO'S "ASSET VERIFICATIONS"

34.     In an attempt to reassure his various clients after the market collapse of 2008, Battoo arranged for "asset verifications," dated September 2009, which purported to confirm the existence and value of the investments in each client's PIWM portfolios as of December 31, 2008 (the "December 31, 2008 Asset Verifications"). At Battoo's direction and with his approval, in or

about late 2009, these asset verifications were sent to Maven, Acadia, Fidelity Insurance, SIAM, and possibly other clients.

35.     The December 31, 2008 Asset Verifications were prepared by Folio Administrators Limited, the administrator for Battoo's operations. The asset verifications stated that Folio had confirmed the existence and value of the assets in the portfolio and that the assets were "maintained in segregated accounts at Alliance [Investment Management]," the custodian for Battoo's operations. Battoo enjoys a cozy relationship with Alliance, with whom over the years he has shared a Bahamian office space, a P.O. Box, a telephone number, and a fax number. The principal of Alliance also sits on PIWM's "investment advisory board" and its "professional executive board."

36.     The December 31, 2008 Asset Verifications quite literally don't add up. For example, they identify investments in at least seven hedge funds that Battoo did not manage. Because these are independent hedge funds, the SEC was able to confirm Battoo's *actual* investments as of December 31, 2008. According to the hedge funds, Battoo's interest in these funds on December 31, 2008 amounted to about **$9 million**. However, in the December 31, 2008 Asset Verifications, Battoo investments in these hedge funds are falsely stated to be approximately **$33 million.**

37.     Moreover, these asset verifications improperly included backdated investments.  For example, they falsely stated that, as of *December 31, 2008*, the PIWM portfolio included holdings in "Horseman Global Fund: Class A"

13

valued at more than $5 million. But Battoo and the corporate defendants didn't take a position in the Horseman fund until ***March 31, 2009***.

38.     Such backdating and overstating has inflated the value of the PIWM portfolios by tens-of-millions of dollars.

39.     Also, Battoo and Alliance provided Maven's auditors with false and misleading confirmations about the investments in Maven's PIWM portfolios. For example, as part of the audit for the year ended December 31, 2008, Maven's auditors sent confirmation requests to PIWM and Alliance regarding the existence and value of the Maven assets under Battoo's management. In response, the auditors received confirmations from both Alliance and Battoo.  The confirmations from Alliance included information similar to the bogus December 31, 2008 Asset Verifications. Likewise, the confirmations Battoo caused to be sent to Maven's auditors (issued under the name PIWM) overstated the value of Maven's investments in the same manner.

40.     In May 2011 Battoo and Alliance sent confirmations to Maven's auditors for the year ended December 31, 2010. These "confirmations" included inaccurate statements regarding the value of the assets Battoo managed for Maven. For example, Alliance reported investments by the Maven B and Maven C portfolios in a particular hedge fund valued at more than $3 million. But the hedge fund's records reflected investments amounting to less than half that.

41.     Maven unknowingly incorporated such inaccurate information

into its audited financials – which Maven sent to its investors. Since January 1, 2011, in the wake of Battoo's dissemination of inaccurate data, Maven investors have directed approximately $6.9 million in new money to Battoo's PIWM-I.

## THE "PERTRAC" REPORTS

42.     In addition to quarterly statements, Battoo regularly generates and sends to investors "PerTrac" reports for his various portfolios. These PerTrac reports provide monthly performance information for each portfolio, and compare the portfolio's cumulative performance with well-established benchmarks like the S&P 500 and Barclay Hedge. The "PerTrac" reports have uniformly reported that Battoo outperforms these and other benchmarks. Battoo sends the PIWM PerTrac reports to current and prospective investors to entice additional investments and new investments.

43.     One such PerTrac report for a Maven PIWM portfolio, dated October 2008, included this "strategy breakdown" reflecting the portfolio's investments in 16 specific funds:



44.     The hedge funds identified in this pie chart subsequently experienced significant losses because of Madoff – including Anchor Hedge Fund-Class A and Santa Clara Fund-Class A, which collectively comprised 12% of the portfolio. Following the 2008 losses, Battoo eliminated all references to specific funds in the pie charts included in future PerTrac reports. In place of verifiable information about specific investments, the new pie charts reflected generic strategy descriptions that apprised investors of precious little. Below is an example of the post-2008 pie chart for the same portfolio:



45.     Other parts of the PerTrac reports were more brazenly contrived. Consider the depiction of "monthly performance" for Maven's B "Growth" PIWM-I portfolio throughout 2008. During 2008, about 19% of that portfolio was invested in funds that fed into Madoff's scheme, and about 20% of the portfolio was indirectly invested in the "fund link certificate" program. In other words, 2008 must have been a terrible year for Maven's B "Growth" PIWM-I portfolio – with nearly 40% of its underlying assets facing devastating losses.

46.     But you wouldn't know it from the PerTrac reports generated at Battoo's direction during 2008. Here's the year-to-date performance reflected in the report for May 2008 – weeks after the bank terminated Battoo from its

program:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | | | | | | | | 5.71% |

47.     The following month's PerTrac report reflected a monthly performance of .75% - net of fees, and with no restatement of performance from previous months:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | | | | | | | 6.50% |

48.     July was also a profitable month for the portfolio – at least according to the PerTrac report. And again, performance from prior months remained static:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | | | | | | 6.81% |

49.     The next month's report would have investors and prospective investors believe that August was the most profitable month of 2008, with a solid 2.39% return net of fees, and without any restatement:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | | | | | 9.36% |

50.     The PerTrac report for September reflected the eighth consecutive profitable month for the portfolio, with a 9.69% return year-to-date, net of fees (again, with no restatement):

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | 0.30% | | | | 9.69% |

51.     The reports for the three subsequent months reflected the portfolio treading water for the last quarter of the year. Still, the report for the full year

performance touted a remarkable annual rate of return exceeding 10% (and that's net of fees):

| Year | Jan | Feb | Mar | Apr | Monthly Performance (%) *Net of Fees* | | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | May | Jun | | | | | | | |
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | 0.30% | 1.52% | | | 11.36% |

| Year | Jan | Feb | Mar | Apr | Monthly Performance (%) *Net of Fees* | | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | May | Jun | | | | | | | |
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | 0.30% | 1.52% | (1.50%) | | 9.69% |

| Year | Jan | Feb | Mar | Apr | Monthly Performance (%) *Net of Fees* | | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | May | Jun | | | | | | | |
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | 0.30% | 1.52% | (1.50%) | 0.54% | 10.28% |

No PerTrac report from 2008 restated performance to account for the substantial losses caused by the bank's freeze-out of Battoo.

52.     Similarly, after the Madoff scam broke in December 2008, one would have expected the PerTrac reports from early 2009 to capture the post-Madoff fallout by restating the historical performance figures to account for the portfolio's significant exposure to Madoff's fraud.

53.     But there are no such disclosures reflected in any 2009 or 2010 PerTrac reports. For example, the September 2010 report sent by Battoo to Maven for the same PIWM-I portfolio contains the following performance figures:

| Year | Jan | Feb | Mar | Apr | Monthly Performance (%) *Net of Fees* | | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | May | Jun | | | | | | | |
| 2010 | (1.61%) | 0.94% | 1.60% | 1.39% | 0.72% | (0.71%) | 2.27% | 1.89% | 0.77% | | | | 7.43% |
| 2009 | (2.16%) | 0.16% | 2.27% | 1.14% | 1.26% | (1.41%) | 3.70% | 1.94% | 1.02% | (2.76%) | 2.19% | 0.26% | 7.68% |
| 2008 | (0.46%) | 1.53% | 0.98% | 1.44% | 2.11% | 0.75% | 0.29% | 2.39% | 0.30% | 1.52% | (1.50%) | 0.54% | 10.28% |

54.     The 2008 "monthly performance" in the September 2010 PerTrac report is literally identical to the one from the December 2008 report. And nothing about the portfolio's putative performance in 2009 suggests that it

captures the two calamitous events from 2008.

55.    Battoo continued to send inaccurate PerTrac reports to PIWM investors, including those who invested in PIWM through Maven, Acadia and The Planning Group, through at least November 2011.

56.    Battoo's false and misleading performance reports enticed many investors to add to their investments and lured new investors. Since January 2009, Battoo and the company-defendants have received over $33 million from Maven. They also received new investment proceeds from Acadia investors, Fidelity Insurance investors, and clients of U.S.-based investment advisers, such as The Planning Group.  All of these entities received false PerTrac reports from Battoo or at his direction.

## TO DATE, BATTOO HAS OFFERED HIS CLIENTS MYRIAD BOGUS EXCUSES, BUT NEXT TO NO REDEMPTIONS

57.    Facing their own redemption pressure, Battoo's clients have begun to clamor for redemption of the assets Battoo manages for them. In response to the mounting redemption requests, Battoo has concocted phony stories to delay and divert investors.

58.    First, Maven and The Planning Group sought return of their capital. Presumably lacking the funds to honor their requests, Battoo misrepresented to them that their investment assets were mired in the MF Global debacle that erupted in about October 2011. He sent Maven and the Planning Group (and other investors) "newsletters" in late November and

December 2011. In them, he stated that the recent implosion of MF Global had rendered him unable to calculate the value of PIWM's investments and thus unable to redeem investments. Battoo estimated that his investment portfolios had suffered exposure because of MF Global ranging from 17% to 39%.

59.     Like the rest of Battoo's stories, this one doesn't check out. The MF Global trustees could only identify three claims related to Battoo's operations – and those amounted to little more than $1 million. Battoo likewise could only confirm the very same $1 million in exposure identified by the MF Global trustees. Battoo, however, purports to manage at least $100 million in PIWM portfolios for the benefit of U.S. investors. Therefore, the $1 million in confirmed MF Global claims in no way supports the massive PIWM exposure that Battoo falsely claimed in his newsletters. When the SEC pressed Battoo to account for this large discrepancy, he refused to do so.

60.     MF Global isn't Battoo's only scapegoat. After months of refusing Maven's redemption requests, Battoo, in a March 2012 phone call with Maven representatives, stated that unnamed counterparties had frozen his assets because of investigations being conducted by the federal government. On information and belief, this assertion is untrue.

61.     Battoo has also told at least one investor that his attorneys were negotiating some sort of "release" with the SEC, which he apparently hoped would hasten the unfreezing of the assets by one of his brokers and a bank. This too was false. The SEC has not been negotiating any kind of release with

Battoo, and neither the broker nor the bank he identified has frozen his assets.

62.    In other instances Battoo has simply gone radio-silent, ignoring his investors and their request for the most basic of information. For example, over the last several months Battoo has refused to provide Maven and its auditors with critical information about the $95 million he manages for Maven. The auditors and Maven have sent repeated confirmation requests to Battoo and to Alliance, his custodian, to confirm the value and existence of the assets managed for Maven. Battoo and Alliance have refused to provide such information about Maven's holdings. Consequently, Maven has been unable to complete its audits for the year ended December 31, 2011.

63.    In May 2012 Battoo sent his clients a newsletter confiding that, in light of complications with MF Global and the unnamed counterparty, PIWM was assessing its options. As he cryptically stated:

> To be frank, PIWM is fully aware of the serious issues that these issues have caused our mandates. PIWM has delivered optimum service for our mandates over the past several years and we are as frustrated as everyone that these issues have severely impacted our abilities to continue to provide our usual level of services. We are also very much aware that these issues have affected significant reputational damage to all involved.
>
> As such PIWM will be issuing another update letter by the first week of June 2012, which will indicate the forward direction of this business. Specifically, based on the level of progress made in resolving these issues, PIWM will make a business decision regarding whether or not it will continue to provide the PIWM global wealth management concept for our mandates or simply opt to globally wind down.

64.    Contrary to his statements in this newsletter, there was no June 2012 update. Battoo continues to keep his investors in the dark, while tightly

clutching what remains of their investments.

## COUNT I

### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT

### (Against Defendants Battoo, BC Panama and BC Hong Kong)

65.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

66.     By engaging in the conduct described above, defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

67.     Defendants intentionally or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

68.     By reason of the foregoing, defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### VIOLATIONS OF SECTIONS 17(a)(2) OF THE SECURITIES ACT

### (Against Defendant Battoo)

69.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

70.    By engaging in the conduct described above, defendant Nikolai S. Battoo, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    By reason of the foregoing, defendant has violated Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

## VIOLATIONS OF SECTIONS 17(a)(3) OF THE SECURITIES ACT

## (Against Defendants Battoo, BC Panama and BC Hong Kong)

72.    Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

73.    By engaging in the conduct described above, defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

74.    Defendants engaged in the devices, schemes, artifices,

transactions, acts, practices and courses of business described above.

75.     By reason of the foregoing, defendants have violated Sections

17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT RULE 10b-5

### (Against Defendants Battoo, BC Panama and BC Hong Kong)

76.     Paragraphs 1 through 64 are realleged and incorporated by

reference.

77.     As more fully described in Paragraphs 1 through 60 above,

defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital

Group Limited (Hong Kong), in connection with the purchase and sale of

securities, by the use of the means and instrumentalities of interstate commerce

and by the use of the mails, directly and indirectly: used and employed devices,

schemes and artifices to defraud; and engaged in acts, practices and courses of

business which operated or would have operated as a fraud and deceit upon

purchasers and sellers and prospective purchasers and sellers of securities.

Further, defendant Nikolai S. Battoo made untrue statements of material fact

and omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not

misleading.

78.     Defendants knew, or were reckless in not knowing, of the facts

and circumstances described in Paragraphs 1 through 60 above.

79.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

80.     Further, Battoo is liable for BC Panama's and for BC Hong Kong's violations in his capacity as a control person of those companies pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 20(a)]. As a senior adviser and the head of the investment advisory board for each company, he controlled nearly every aspect of their business, and asserted complete control over their actions. Further, Battoo was a vital part of the fraud perpetrated on investors and prospective investors.

## COUNT V

### VIOLATIONS OF ADVISERS ACT SECTION 206(4) AND ADVISERS ACT RULE 206(4)-8

### (Against Defendants Battoo, BC Panama and BC Hong Kong)

81.     Paragraphs 1 through 64 are realleged and incorporated by reference.

82.     Defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), acted as investment advisers to pooled investment vehicles.

83.     Defendant Nikolai S. Battoo made untrue statements of material fact or omitted to state a material fact necessary to make the statements made,

in the light of the circumstance under which they were made, not misleading, to investors or prospective investors in a pooled investment vehicle.

84.     Defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited engaged in acts, practices or courses of business that were fraudulent, deceptive or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

85.     By reason of the foregoing, defendants have violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Advisers Act Rule 206(4)-8 thereunder. [17 CFR 275.206(4)-8].

## COUNT VI

## VIOLATIONS OF SECTION 15(a)(1) OF THE EXCHANGE ACT
### (Against All Defendants)

86.     Paragraphs 1 through 64 are realleged and incorporated by reference.

87.     Defendants Tracy Lee Sunderlage, Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), by the conduct described above, directly or indirectly, singularly or in concert, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or induce or attempt to induce, the purchase or sale of securities, without registering with the Commission as a broker or dealer.

88.     By reason of the foregoing, defendants have violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT VII

## VIOLATIONS OF SECTION 15(b)(6)(B)(i) OF THE EXCHANGE ACT

### (Against Defendant Sunderlage)

89.     Paragraphs 1 through 64 are realleged and incorporated by reference.

90.     Despite a bar previously entered by the Commission, Defendant Tracy Lee Sunderlage induced or attempted to induce, the purchase or sale of securities, without registering with the Commission as a broker or dealer. He engaged in such conduct without the consent of the Commission. In so doing, Defendant Sunderlage violated the Commission's associational bar against him.

91.     By reason of the foregoing, Defendant Sunderlage violated Section 15(b)(6)(B)(i) of the Exchange Act.

## COUNT VIII

## VIOLATIONS OF SECTION 203(f) OF THE ADVISERS ACT

### (Against Defendant Sunderlage)

92.     Paragraphs 1 through 64 are realleged and incorporated by reference.

93.     Despite a bar previously entered by the Commission, Defendant Tracy Lee Sunderlage was designated an investment adviser for investors in securities and earned advisory fees for his services. He engaged in such conduct without the consent of the Commission. In so doing, Defendant Sunderlage

violated the Commission's associational bar against him.

94. By reason of the foregoing, Defendant Sunderlage has violated Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3(f)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), and Tracy Lee Sunderlage committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), and BC Capital Group Limited (Hong Kong), their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Exchange Act Rule 10b-5 [17 CFR 240.10b-5] thereunder.

### III.

Enter an Order of Permanent Injunction restraining and enjoining defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), and Tracy Lee Sunderlage, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## IV.

Enter an Order of Permanent Injunction restraining and enjoining defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), and BC Capital Group Limited (Hong Kong), their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Advisers Act Rule 206(4)-8 [17 CFR 275.206(4)-8].

## V.

Enter an Order of Permanent Injunction restraining and enjoining

defendant Tracy Lee Sunderlage, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendant who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(b)(6) of the Exchange Act [15 U.S.C. § 78o(b)(6)] and Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3(f)].

## VI.

Issue an Order requiring defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), and Tracy Lee Sunderlage to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

## VII.

With regard to the defendants Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), and Tracy Lee Sunderlage's violative acts, practices and courses of business set forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**VIII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**IX.**

Grant such other relief as this Court deems appropriate.

> **UNITED STATES SECURITIES**
> **AND EXCHANGE COMMISSION**
>
> By: _/s/ Daniel J. Hayes_
>      Daniel J. Hayes

Daniel J. Hayes
Jonathan S. Polish
Eric M. Phillips
John J. Sikora, Jr.
John D. Mitchell
**U.S. SECURITIES AND**
 **EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

Dated: September 6, 2012