**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States Securities and Exchange Commission, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:12-CV-07125 |
| v. | ) ) | Judge Edmond E. Chang |
| Nikolai S. Battoo, BC Capital Group S.A. (Panama), BC Capital Group Limited (Hong Kong), and Tracy Lee Sunderlage | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The United States Securities and Exchange Commission brought this federal securities law action against various individual and corporate-entity defendants, asserting that they engaged in a Ponzi scheme to defraud investors.[1] The SEC now moves for summary judgment against the one remaining defendant (the others defaulted), Tracy Sunderlage, for violating Section 15 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78o(a)(1), 78o(b)(6)(B)(i)] and Section 203(f) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-3(f)]. In 1986, the SEC barred Sunderlage from associating with any broker, dealer, investment adviser, investment company or municipal securities dealer after finding that Sunderlage made material misstatements to investors and sold unregistered securities. R. 126,

---

[1]The Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

PSOF ¶ 4.[2] Since then, Sunderlage has worked, in various capacities, with companies that promote and administer employee welfare benefit plans and variable annuities. The SEC argues that the welfare benefit plans and variable annuities are, in reality, securities that form the basis of a complex investment scheme that Sunderlage helped to orchestrate. By promoting and facilitating the purchase and sale of these alleged securities, and advising scheme participants about these securities, the SEC contends that Sunderlage has acted as both a broker and an investment adviser in violation of the SEC's bar. For the reasons described below, the SEC's motion is granted.

## I. Background

For purposes of this motion, the following facts are viewed in the light most favorable to Sunderlage (because he is the non-movant), and all reasonable inferences are drawn in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In 1986, the SEC instituted an administrative proceeding against Sunderlage after finding that he sold over $1.5 million worth of unregistered securities and made material misstatements to over 100 clients. PSOF ¶ 4; R. 126-2 at 46 (Exh. 2). The SEC barred Sunderlage from associating with any broker, dealer, investment adviser, investment company, or municipal securities

---

[2]Citations to the record filings are "R." followed by the docket number and, when necessary, a page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "PSOF" (for SEC's Statement of Facts) [R. 126]; "DSOF" (for Sunderlage's Statement of Additional Facts) [R. 137 at 41-47]; "Def.'s Resp. PSOF" (for Sunderlage's Response to SEC's Statement of Facts) [R. 137 at 1-40]; and "Pl.'s Resp. DSOF" (for SEC's Response to Sunderlage's Statement of Additional Facts) [R. 144]. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is challenged, it is so noted.

dealer. PSOF ¶ 5; Exh. 2 at 3. Under the SEC's order, Sunderlage could reapply to associate with a broker or investment adviser after twenty-five months. Exh. 2 at 3. Sunderlage never reapplied. PSOF ¶ 6.

Beginning in 1989, Sunderlage began working with various companies to promote and administer welfare benefit plans and variable annuities. *Id.* ¶ 26. The first of these plans was the "Professional Benefit Trust Multiple Employer Employee Welfare Benefit Plan and Trust" (Multi-Employer Plan). *Id.* ¶ 29. Under the Multi-Employer Plan, employers would make tax deductible contributions to a welfare benefit trust. *Id.* PBT, Ltd. (PBT), a Caribbean company owned and operated by Sunderlage, served as the trustee of the Multi-Employer Plan. *Id.* ¶¶ 9, 10, 30. As trustee, PBT would pool together employer contributions and invest them in, among other things, insurance products and stocks, for the employers' benefit. *Id.* ¶ 30. Sunderlage, either himself or through companies he controlled, would market and promote the Multi-Employer Plan to U.S. citizens via promotional materials and informational conferences. *Id.* ¶ 31. Employers received a pro rata share of plan assets when they terminated their participation in the Multi-Employer Plan. *Id.* ¶ 32; R. 137, Def.'s Resp. PSOF ¶ 32.

In 2003, a single employer plan (Single-Employer Plan) replaced the Multi-Employer Plan. PSOF ¶ 33. PBT transferred assets held in the Multi-Employer Plan, including cash, cash value life insurance policies and other securities into the Single-Employer Plan. PSOF ¶ 47. Under the Single-Employer Plan, employers made tax-deductible contributions to a single employer plan trust. *Id.* ¶ 34. PBT, as

the trustee of the Single-Employer Plan trusts, took employer contributions and invested them in insurance products—such as a Living Benefits Policy[3]—sold by Maven Assurance Limited (Maven Assurance), a Caribbean insurance company. *Id.* ¶¶ 24, 35. Sunderlage was a founder and director of Maven Assurance. *Id.* ¶ 24; Def.'s Resp. PSOF ¶ 24.

In addition to paying premiums, employers participating in the Single-Employer Plan had to become a Maven Assurance shareholder. PSOF ¶ 36; Def.'s Resp. PSOF ¶ 36. Employers became indirect shareholders of Maven Assurance by purchasing variable annuities issued to Maven Life International Limited (Maven Life) or Acadia Life International Limited (Acadia Life). PSOF ¶ 37. The variable annuity held the employer's Maven Assurance shares. *Id.*

Per the Maven Assurance stock Subscription Agreement, each employer (via a variable annuity) had a Protected Premium Account (PPA) with Maven Assurance. *Id.* ¶ 39. Employer contributions funded the PPAs and were invested in securities. *Id.* ¶¶ 39, 40. The Subscription Agreement also allowed Maven Assurance shareholders to determine where to invest the money inside their PPAs. *Id.* ¶ 41. Shareholders could choose from three or four investment portfolios, all of which were part of the Private International Wealth Management-Insurance (PIWM-I) program managed by Nikolai Battoo. *Id.* ¶¶ 41, 42.

Shareholders benefited from gains in the PPAs. *Id.* ¶ 43. For example, shareholders could receive dividends on the Maven Assurance stock associated with

---

[3]The Living Benefits Policy was the brand name of Maven Assurance's health insurance policy. R. 137, DSOF ¶ 11. The policy included long-term care, disability income, excess major medical and critical illness coverage. *Id.*

their PPA. *Id.* ¶ 45. The Maven Assurance Board of Directors determined whether to declare a dividend payable on the shareholder's stock. *Id.*; Def.'s Resp. PSOF ¶ 45. Employers could also receive a dividend when they terminated their participation in the Single-Employer Plan. PSOF ¶ 46; Def.'s Resp. PSOF ¶ 46. From 2007 to 2010, Maven Assurance paid out over 150 times more in dividends to employers participating in the Single-Employer Plan than it did in insurance claims. PSOF ¶¶ 49-52. In 2009 and 2010 alone, Maven Assurance traded more than $147 million in securities. *Id.* ¶ 48.

In addition to the Multi- and Single-Employer Plans, Sunderlage also helped promote and administer the Maven Life single premium deferred annuity. *Id.* ¶ 53. Investors used their Maven Life annuity to invest in Maven Assurance stock, PIWM-I portfolios, and other securities. *Id.* ¶ 54. Several of Sunderlage's clients purchased a Maven Life annuity at his recommendation. *Id.* ¶ 55; Def.'s Resp. PSOF ¶ 55.

Sunderlage also owned and operated Sunderlage Resource Group, Inc. (SRG), which in turn managed SRG International.[4] PSOF ¶ 57. SRG International was a shell company created to promote the Employer Plans and Maven Life variable annuity. *Id.* To do this, SRG International contracted with U.S.-based sales agents or "advisers"—including investment advisers—who would solicit investors. *Id.* ¶ 58. Sunderlage maintained a personal "block of business" through SRG International. *Id.* ¶ 59; Def.'s Resp. PSOF ¶ 59. This "block of business" included over 100 clients

---

[4]Sunderlage was the CEO and a director of SRG International. DSOF ¶ 23.

(they were primarily American), all of whom invested in Maven Assurance or Maven Life products. PSOF ¶ 69.

To promote the Multi-Employer Plan, Single-Employer Plan, and Maven Life variable annuity, SRG International and Sunderlage distributed marketing materials to U.S. clients and organized conferences for current and potential clients. PSOF ¶¶ 60, 61; Def.'s Resp. PSOF ¶ 60. Sunderlage presented and marketed himself at these conferences as having experience in "advanced tax planning, international advanced wealth strategies, … sophisticated investment strategies, [and] alternative investments." PSOF ¶ 62; R. 126-4 at 150 (Exh. 41). The SEC asserts that Sunderlage and SRG International (remember, Sunderlage was SRG International's CEO) gave presentations to groups on investment strategies, the Employer Plans, and the Maven Life annuity at U.S.-based conferences; Sunderlage disputes that he did so in the United States. *Compare* PSOF ¶ 63, *with* Def.'s Resp. PSOF ¶ 63. The SEC also contends that Sunderlage and other SRG International representatives also met privately with potential and current clients at the conferences. PSOF ¶ 64.

Once a prospective investor became a client, SRG International had the client sign an agreement designating SRG International (or Sunderlage) as the client's investment adviser or manager. *Id.* ¶ 59; R. 126-8 at 17 (Exh. 64); R. 126-9 at 18 (Exh. 67); R. 126-9 at 24 (Exh. 69). Those agreements gave SRG International (or Sunderlage) authority to direct, manage, and invest client funds. PSOF ¶ 59; Exh. 64; Exh. 67 ¶ 2; Exh. 69 at Acadia SEC 00270.

U.S. clients also executed Power of Attorney forms giving SRG International full authority to execute documents on a client's behalf. PSOF ¶¶ 65, 66; Def.'s Resp. PSOF ¶ 65; R. 127-5 at 28 (Exh. 36); R. 127-6 at 3 (Exh. 37). SRG International also handled and forwarded clients' monies offshore to Maven Assurance. PSOF ¶ 67.

SRG International received millions of dollars in commissions and asset-based trail fees from Maven Assurance, Maven Life, and another entity, BC Capital, which was owned by Battoo. *Id.* ¶ 74. For example, under its marketing agreement with Maven Assurance, SRG International received (1) a commission of 10% of the premium paid over a seven-year period (or 50% of the first year premium) for every Living Benefits Policy sold; and (2) an annual trail fee of 0.4% based on the final balance of each participant's PPA. *Id.* ¶ 75; R. 126-5 at 62 (Exh. 53 at SUB000552). Likewise, under its marketing agreement with Maven Life, SRG International received (1) a commission of 4.5% of all new premiums (with an optional 2% overwrite); and (2) an annual trail fee of 0.4% based on the final balance of a participant's variable annuity. PSOF ¶ 76; R. 126-5 at 1 (Exh. 42 at SUB000560).

In 2009 and 2010, Maven Assurance incurred over $1 million in commissions payable to SRG International. PSOF ¶ 82. During this same period, Maven Life incurred over $100,000 in commissions payable to SRG International. *Id.* SRG International distributed most of the commissions and fees to SRG—and later to SRG International U.S. LLC (SRG U.S.)—which in turn would issue checks to SRG International's advisers. *Id.* ¶¶ 84, 85. In addition to receiving a W-2 wage from

SRG, DSOF ¶ 26, Sunderlage also generated commissions and trail fees from his personal block of business, PSOF ¶¶ 86, 87; Def.'s Resp. PSOF ¶¶ 86, 87. The parties dispute whether SRG International or Sunderlage retained the commissions and fees generated by Sunderlage. *Compare* PSOF ¶¶ 87, 88, *with* Def.'s Resp. PSOF ¶¶ 87, 88.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th

Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Securities versus Insurance

The SEC brings three counts against Sunderlage. The first two counts allege violations of the Securities Exchange Act: (1) by inducing or engaging in securities transactions without registering as a broker or dealer with the SEC, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1) (Count 6); and (2) by associating with a securities broker or dealer without the SEC's consent after being previously barred from doing so by the SEC, in violation of Section 15(b)(6)(A), (B)(i) of the Exchange Act, 15 U.S.C. § 78o(b)(6)(A), (B)(i) (Count 7). The third count alleges that Sunderlage violated the Advisers Act by associating with an investment adviser,[5] in violation of § 203(f) of the Advisers Act, 15 U.S.C. § 80b-3(f). In alleging that Sunderlage violated either the Exchange Act or the Advisers Act, the threshold element that the SEC must prove is that the Multi-Employer Plan, Single-Employer Plan, and Maven Life variable annuity are "securities" under those laws. As discussed next, no reasonable trier of fact could find otherwise: they are securities.

---

[5]Under the Advisers Act, an "investment adviser" is defined as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities … ." 15 U.S.C. § 80b-2(a)(11).

### 1. Investment Contract

The parties dispute whether the Employer Plans are investment contracts. Both the Exchange Act and the Advisers Act define "security" to include an "investment contract." 15 U.S.C. §§ 78c(a)(10), 80b-2(a)(18). Defined by the Supreme Court long ago, an investment contract is: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others. *SEC v. W.J. Howey*, 328 U.S. 293, 298-99 (1946). "'[F]orm should be disregarded for substance and the emphasis should be on economic reality'" when determining whether a transaction or scheme is an investment contract. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975) (quoting *Techerepnin v. Knight*, 389 U.S. 332, 336 (1967)). The "economic reality" underlying the Employer Plans demonstrates that the Plans are investment contracts under *Howey*.

First, employers did "invest" money in order to participate in the Multi- and Single-Employer Plans. A key element of an "investment" is "g[iving] up some *tangible and definable consideration* in return for an interest that ha[s] substantially the characteristics of a security*." Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (emphasis added); *id.* at 559 (determining factor is whether an investor "chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security").

Here, employers paid substantial consideration in the form of premiums and contributions to PBT, the trustee of the Employer Plans, and Maven Assurance.

PSOF ¶¶ 30, 35, 37. PBT and Maven Assurance then invested these premiums in securities, including PIWM-I investment portfolios. *Id.* ¶¶ 30, 35. Consistent with characterizing the moneys as investments, SRG International informed employers that they could receive a return on these investments. PSOF ¶¶ 32, 45, 46; Def.'s Resp. PSOF ¶¶ 32, 45, 46.

Second, employers invested the premiums and contributions in a common enterprise (the second element of the *Howey* test).[6] The Seventh Circuit requires a showing of "horizontal commonality" to establish a common enterprise. *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984). Horizontal commonality exists where "multiple investors [ ] pool their investments and receive pro rata profits." *Id.*; *see also SEC v. Lauer*, 864 F. Supp. 784, 790 (N.D. Ill. 1994) ("Horizontal commonality is a pooling of interests not only between the developer or promoter and each individual investor but also among the investors … ." (internal quotations and citations omitted)).

Horizontal commonality existed with respect to the Employer Plans. PBT pooled together employer contributions to purchase securities. PSOF ¶¶ 30, 40-43. In addition to pooling employers' interests, the Plans also tied SRG International's interests to the investments. *Id.* ¶¶ 75, 78. For example, SRG International received a 0.4% annual trial fee from Maven Assurance based on the final balance of each employer's PPA—as an employer's investment grew within its PPA, so too did the trail fee that SRG International received. *Id.* ¶¶ 75, 78; Exh. 53 at SUB000552.

---

[6]Sunderlage does not dispute that the common enterprise element has been met. *See* Def.'s Resp. Br.

Moving on to the third element of the *Howey* test, employers had an expectation of profits from their contributions to the Employer Plans. In this context, "profits" means either "capital appreciation resulting from the development of the initial investment, … or a participation in earnings resulting from the use of investors' funds." *Forman*, 421 U.S. at 852; *see also SEC v. Edwards*, 540 U.S. 389, 394 (2004) ("profits" include "dividends, other periodic payments, or the increased value of the investment"). Courts generally look at the motivation behind a transaction—as evidenced, for example, by marketing materials used to promote the transaction and the economic substance of the underlying transaction—when determining whether a purchaser expected a financial return. *Forman*, 421 U.S. at 853.

Where a promoter primarily marketed the transaction as an investment, that itself is strong evidence that clients had an expectation of profits. *See, e.g., SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943); *Goodman v. Epstein*, 582 F.2d 388, 408 n.57 (7th Cir. 1978) (finding that housing development project was an investment contract because the defendants' brochure "featured detailed financial projections for the 'Healy Farm Project' … showing large figures for 'net income' and 'profit' which could reasonably be expected"); *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 325 (7th Cir. 1983) (observing that an insurance company promoted the alleged investment contract by "offering the pension plan a chance to share in the insurance company's investment experience"); *Lauer*, 864 F. Supp. at 791 (finding an investment contract where "[t]he program

was marketed as having a dominant investment intent in view of the emphasis on the extraordinary returns which could be earned … ."). For example, in *SEC v. C.M. Joiner Leasing Corp.*, the Supreme Court held that an oil well lease was an investment contract where the contract included an economic inducement—the exploratory drilling of a test well. 320 U.S. at 348. The Court found that advertising material promoting the oil well lease emphasized the promised exploration and demonstrated that the prospect of drilling gave the investments "most of their value and all of their lure." *Id.* at 349. Because the advertisement highlighted the economic benefit from the exploratory drilling, the Court held that the leasehold right was an investment contract. *Id.* at 348-49.

Like the promoters in *Joiner*, both Sunderlage and his companies persistently represented the substantial profits that investors in the Multi- and Single-Employer Plans stood to gain. Sunderlage tries to characterize the Plans as insurance products, but that is not how he promoted them. For example, promotional materials sent to Multi-Employer Plan participants market the Plan as a 100% business tax deduction and as an investment that generates income and protects participants' assets. PSOF ¶ 60; R. 126-4 at 1 (Exh 38 at Hibbard-31 (touting SRG International's ability to obtain "higher portfolio performance," "[h]igher guaranteed interest rates," "[t]ax efficiency, "tax deductions," and "[b]ulletproof asset protection" for its clients); FSEC 377 (highlighting four life insurance "Investment Objectives": (1) Investment return; (2) Tax efficiency; (3) Asset protection; and (4) Access to capital); FSEC 399 (presentation titled "Offshore

Captive Insurance Strategies[:] A Way to Create Substantial Income Tax Deductions"). Likewise, materials marketing the Single-Employer Plan also emphasize participants' return on investment: brochures and handouts characterize the Plan as an investment and highlight the prospect of financial returns. *See* R. 143, Pl.'s Reply Br. at 4; R. 137-5 at 65 (Exh. 4 at SEC-JB-64-65); R. 126-5 at 80 (Exh. 57 at SIUS LLC 566-68); R. 126-6 at 1 (Exh. 58 at SIUS LLC 643); R. 126-19 at 9 (Exh. 86 at SIUS LLC 597); R. 126-7 at 1 (Exh. 61 at SIUS LLC 750-52; SIUS LLC 754-55). For example, an SRG International brochure from a Las Vegas conference touts Maven Assurance investment portfolios—used to invest employers' premiums—as "custom tailored to meet financial objectives" and "designed to deliver absolute *returns*." Exh. 58 at SIUS LLC 643 (emphasis added). A Maven Assurance brochure likewise advertises that under the Single-Employer Plan, "[s]tock is issued for each PPA and ownership of the stock is arranged through a variety of *investment* vehicles. When excess assets become surplus … a divided is declared and paid to the stock owner of the PPA." Exh. 86 at SIUS LLC 597 (emphasis added). The 2009 Annual Report for the Maven entities further evidences that the Plan was an investment: the Report provides a multi-paged, detailed analysis of the companies' financial returns and investments in the PIWM-I portfolio, while making no mention of the amount of insurance claims paid by the companies and only cursorily discussing the companies' "insurance" products. *See* Pl.'s Reply Br. at 4; R. 126-8 at 19 (Exh. 65). Sunderlage and his companies did not try to lure clients by marketing the Employer Plans as insurance products; rather,

they persistently portrayed the Plans as "having a dominant investment intent." *Lauer*, 864 F. Supp. at 791.

Even viewing the evidence in Sunderlage's favor as much as reasonably possible, his contention that the Single-Employer Plan was primarily marketed as an insurance product must be rejected. Sunderlage relies heavily on a single brochure that discusses the insurance components of the Living Benefits Policy. *See* DSOF ¶ 15; R. 126-19 at 4 (Exh. 85). But the issue is whether the record evidence establishes that "the scheme was being promoted *primarily* as an investment." *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982) (emphasis added); *see also Forman*, 421 U.S. at 853 (holding that housing cooperative program was not an investment contract after observing that "[n]owhere does the Bulletin seek to attract investors by the prospect of profits"); *Lauer*, 864 F. Supp. at 791 (finding program was an investment contract because marketing materials placed an "emphasis" on potential financial returns). The legion of promotional materials discussed and cited above, and the repeated references to the Plan as investments and the lure of returns on those investments, cannot be undermined by the one brochure that discusses the insurance aspects of the Plan (nor does the brochure's discussion of insurance aspects of the Plan undermine the *primary* investment aspects of the Plan).

In addition to promotional materials, the economic substance of a transaction is also proof of whether an investor had an expectation of profits. In *Forman*—in contrast to what happened here—the Supreme Court found it persuasive that the

parties produced no evidence suggesting that residents derived any profit from the cooperative. 421 U.S. at 856 ("[N]othing in the record suggests that the facilities *in fact* return a profit … ." (emphasis added)); *id.* at 856-57 ("The short of the matter is that the stores and services in question were established not as a means of returning profits to tenants, but *for the purpose of* making essential services available for the residents of this enormous complex." (emphasis added)). In contrast, this case is more like those cases where profits were expected. *E.g.*, *Epstein*, 582 F.2d at 407 (finding that limited partners in a partnership had an expectation of profit based on "the underlying legal nature of the limited partnership interest … [and] the basic common sense presumption that business ventures are entered into for profit"). The economic substance of the Employer Plans shows that the primary benefit investors expected to receive was income in the form of tax-deductions and dividends. Until the scheme came crashing down, Maven Assurance's financial statements reveal that the Employer Plans generated substantial dividends for the participants (and substantial fees for SRG International's advisers). *See* PSOF ¶¶ 49-52; R. 126-9 at 63 (Exh. 70); R. 126-9 at 112 (Exh. 72); R. 126-9 at 149 (Exh. 74); R. 126-10 at 18 (Exh. 76). Maven Assurance declared nearly $34 million in dividends while only paying $211,003 in insurance claims between 2007 and 2010. PSOF ¶¶ 49-52. Although in some contexts $211,003 is a lot of money, it pales in comparison to the dividends, so the insurance aspects of the Plans were not the primary substance of the transaction. And in some years insurance claims paid out by Maven Assurance were actually

negligible or nonexistent. *Id.* In 2007, for example, Maven Assurance paid $0 in insurance claims. *Id.* ¶ 49; Exh. 70 at ISC-SM 1745-46. Even giving all reasonable inferences to Sunderlage, the facts show that generating dividends (in exchange for a fee) formed the economic substance of the Employer Plans; paying out insurance claims was merely incidental to Sunderlage's investment scheme. The economic substance of the Employer Plans, combined with the materials used to promote them, establish that investors expected a return on the premiums they paid to Maven Assurance. Expectation of profits is the third and final element of *Howey*, so the SEC has established that the Plans were investment contracts, and thus met the definition of securities.

## 2. Variable Annuity

The next issue is whether the Maven Life annuity meets the definition of a security. The SEC asserts that Sunderlage has admitted—in his Answer to the SEC's complaint—that the Maven Life annuity is a security, Pl.'s Reply Br. at 1, and that in any event, the record evidence establishes that the variable annuities are securities. R. 125, Mot. Summ. J. at 15 n.14. Sunderlage maintains that there is a genuine issue of fact on whether the Maven Life variable annuity has the attributes of a security. Def.'s Resp. Br. at 7-9.

To start, the SEC is correct that Sunderlage admitted this point in his Answer to the complaint. Specifically, Sunderlage admitted that he "received fees and commissions from the sale of *variable annuities and other securities* to Maven clients." R. 71, Def.'s Answer to Compl. ¶ 14(d) (emphasis added). This admission is

binding. In *Crest Hill Land Dev., LLC v. City of Joliet*, the Seventh Circuit held that the defendant's answer admitting that a specific street was a highway "constitute[d] a binding judicial admission," which "ha[d] the effect of withdrawing the question of whether [the street was a highway] from contention[ ] for the purposes of summary judgment … ." 396 F.3d 801, 805 (7th Cir. 2005); *see also Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995). Holding a defendant to an admission makes sense, because once a defendant admits a fact in an Answer, then the plaintiff rightfully believes that there is no need to pin down the fact in discovery. *See Crest Hill Land Dev. LLC*, 396 F.3d at 805 ("'Surprises' such as new arguments or defense theories propagated after the completion of discovery and filing of summary judgment are wisely discouraged.") So, by conceding that the Maven Life variable annuity was a security in his Answer, Sunderlage withdrew this fact from contention. He cannot now argue otherwise.

In any event, even without the admission, there is no genuine factual issue over whether the Maven Life variable annuity is a security under the Exchange Act and the Advisers Act. In *SEC v. Variable Annuity Life Insurance Co. of America*, the Supreme Court considered whether a variable annuity was a security or instead constituted a form of insurance. 359 U.S. 65, 69-71 (1959). The Court reasoned that while insurance "involve[d] some investment risk-taking on the part of the [insurance-issuer]" and "a guarantee that at least some fraction of the benefits will be payable in fixed amounts," a variable annuity placed *all* investment risk on the *investor* and did not pay a fixed return. *Id.* at 71; *see also Otto v. Variable Annuity*

*Life Ins. Co.*, 814 F.2d 1127, 1132 (7th Cir. 1986) (finding that defendant's annuity plan was not a security because "[defendant] was required to pay a guaranteed rate of interest on all fixed annuity contributions … ."); *Soranno v. New York Life Ins. Co.*, 1999 WL 104403, at *9 (N.D. Ill. Feb. 24, 1999) ("The relevant question with respect to variable annuities is whether they place the entire investment risk on the buyer or whether they provide some guarantee to the buyer.").

In the face of the evidence that investors bore all of the risk, Sunderlage offers no evidence that Maven Life incurred any investment risk as a result of issuing a Maven Life variable annuity. Indeed, Maven Life's audited financial statements explicitly state that the contract holder—the annuitant—"bears the *full investment risk* of, and receives all the benefits (net of fees) from, the segregated assets supporting the contract." R. 126-10 at 38 (Exh. 77 at JL 60) (emphasis added). Further, Maven Life did not pay any fixed amount to the annuitant; rather, investors used the annuity to invest in Maven Assurance, PIWM-I portfolios, or other securities.[7] PSOF ¶¶ 54, 55; Exh. 80 at SIUS LLC 546; R. 126-19 at 65 (Exh. 91 at 2). For example, William Voigt, an Illinois resident, bought a Maven Life annuity to invest in a PIWMI-I portfolio. PSOF ¶ 56; R. 126-2 at 343 (Exh. 11 ¶ 12); R. 126-19 at 71 (Exh. 92 at SEC-KVOIGHT-4). Investors who used their annuity to invest in PIWM-I portfolios could expect an annual return anywhere between 5% and 22% on their investment. Exh. 80 at SIUS LLC 547. Rather than receive any

---

[7]Sunderlage's argument that the SEC failed to quantify the percentage of annuities that Maven Life clients directly invested in securities, *see* Def.'s Resp. Br. at 9, is beside the point. Sunderlage can be found liable if he acted as a broker or as an investment adviser in even a single securities transaction.

fixed rate of return, annuitants' annual income would rise and fall based on the success of their investments. Without any evidence to the contrary, the evidence establishes that the Maven Life variable annuity was a security.

## B. Statute of Limitations

Having concluded that a reasonable trier of fact must find that the financial interests at issue were in fact "securities," the next question is whether the SEC has proven the other elements of the specific counts. But before tackling those questions, Sunderlage makes a generalized argument that no conduct that occurred more than five years before the suit's filing can form the basis of any of the SEC's claims. He bases this argument on the statute of limitations that applies to federal agency actions seeking fines, penalties, or forfeiture. Under 28 U.S.C. § 2462, there is a five-year statute of limitations for any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise … ." So Sunderlage contends that Section 2462 bars the SEC's claim as to pre-September 6, 2007 conduct.[8] Def.'s Resp. Br. at 2 n.2. If Section 2462 applies, then the part of the SEC's claim arising from the Multi-Employer Plan, which terminated before 2007,[9] would be time-barred.

It is true that the SEC seeks civil penalties for Sunderlage's alleged violations of the Securities Act and the Advisers Act, so the claim for *penalties* cannot be based on pre-September 6, 2007 conduct. But the SEC also seeks a permanent injunction and disgorgement. *See* Compl. at 29-32. The question is

---

[8]The SEC filed this action on September 6, 2012. *See* R. 1, Compl.
[9]The parties dispute when Sunderlage and his companies terminated the Multi-Employer Plan. *Compare* DSOF ¶ 3, *with* Pl.'s Resp. DSOF ¶ 3.

whether claims seeking injunctive relief and disgorgement are also subject to a five-year limitations period. The text of § 2462 does not say anything about injunctive relief; remember, the statute covers actions seeking a "civil fine, penalty, or forfeiture, pecuniary or otherwise." An injunction is not similar in nature to fines or penalties, which are monetary, nor to forfeitures, which either are monetary or could require the giving-up of certain property. In contrast, an injunction against a defendant is an order directing that the defendant act—or not act—in a certain way. The issue of disgorgement is a closer question, but disgorgement is also typically viewed as an equitable remedy, like injunctive relief. This line of reasoning is consistent with district-court decisions in the Seventh Circuit. For example, in *SEC v. Ogle*, the SEC sought, among other things, disgorgement and a permanent injunction for securities violations. 2000 WL 45260, at *3-4 (N.D. Ill. Jan. 11, 2000). The district court observed that "disgorgement, and injunction constitute equitable relief," and reasoned that "Section 2462 does not apply to SEC civil enforcement actions seeking equitable relief because equitable remedies merely preserve the *status quo*; they do not constitute a punitive award." *Id.* at *4. The court concluded that SEC actions "seeking equitable relief are not subject to any limitations period,"[10] and as a result, held that the disgorgement and injunctive relief claims were timely. *Id.*; *see also SEC v. Fisher*, 2008 WL 2062699, at *8 (N.D. Ill. May 13, 2008) (holding that the SEC's claims for disgorgement and an injunction were not

---

[10]The Court notes that 28 U.S.C. § 1658—the federal catchall statute of limitations—also does not apply to the SEC's claims for disgorgement and an injunction. Section 1658 imposes a four-year statute of limitations on a civil action arising under a federal law enacted *after* December 1, 1990. Given this, Section 1658 does not apply to either the Exchange Act or the Advisers Act.

subject to a five-year limitations period because "§ 2462 does not apply to actions seeking purely equitable relief"); *SEC v. Lorin*, 869 F. Supp. 117, 1126-27 (S.D.N.Y. 1994) (reasoning that Congress' decision to provide limitation periods for specific securities activity, such as insider trading, evidenced its "desire[] to keep the SEC free from limitation periods in [actions seeking equitable relief]").[11]

In view of the distinction between, on the one hand, fines, penalties, and forfeitures, and on the other hand, equitable relief like injunctions and disgorgement, the Court concludes that § 2462 does not bar the SEC's claim for disgorgement and injunctive relief arising from pre-September 6, 2007 conduct. What's more, Sunderlage does not offer any alternative limitations period for the equitable relief, so he has forfeited any other statute-of-limitations argument. So with § 2462 out of the way, the SEC's claims for equitable relief can reach back indefinitely before September 6, 2007.

### C. Counts Six and Seven (Securities Exchange Act of 1934)

The SEC alleges that Sunderlage violated two provisions of the Exchange Act: (1) Section 15(a)(1), which bars unregistered brokers from using interstate commerce to conduct securities transactions; and (2) Section 15(b)(6)(B)(i), which requires any person who has been barred from associating with a broker to obtain SEC approval to willfully "associate[] with a broker." 15 U.S.C. § 78o(a)(1), (b)(6)(B)(i). Sunderlage resists liability by presenting two arguments: (1) whether

---

[11]Neither the Seventh Circuit nor the Supreme Court appears to have decided this issue. *See Gabelli v. SEC*, 133 S. Ct. 1216, 1220 n.1 (2013) (observing that "[t]he SEC also sought injunction relief and disgorgement, claims the District Court found timely on the ground that they were not subject to § 2462. Those issues are not before us").

the Exchange Act applies to the securities transactions at issue, which Sunderlage contends were transactions outside the United States; and (2) whether Sunderlage acted as, or associated with, an unregistered broker.

## 1. The Exchange Act and Domestic Transactions

The parties dispute whether U.S. securities laws govern the transactions at issue. Sunderlage contends that the alleged transactions fall outside the scope of the Exchange Act because they are not "domestic transactions" under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265-67 (2010). Def.'s Resp. Br. at 10. The SEC maintains that Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (Dodd-Frank Act), overruled *Morrison* and reinstated the "conduct and effects" test for actions brought by the SEC. Pl.'s Reply Br. at 13-17. Further, the SEC contends that even if *Morrison* applies, the transactions at issue are "domestic" and subject to U.S. securities laws as a result. *Id.* at 17-19.

## a. Section 929P(b) and Retroactivity

It is not necessary to decide whether Section 929P(b) does indeed overrule *Morrison* for actions brought by the SEC,[12] because the Court concludes that

---

[12]There is no binding case law that decides whether the Dodd-Frank Act reinstated the conduct-and-effects test for actions brought by the SEC. As the SEC acknowledges, some courts have expressed doubt that Section 929P(b) overruled *Morrison*. Section 929P(b) only says that courts have subject-matter *jurisdiction* over an action brought by the SEC involving securities violations that are covered by the conduct-and-effects test. But the Supreme Court did not decide *Morrison* on *jurisdictional* grounds, but rather held that the pertinent securities law did not cover "foreign" transactions. *See, e.g.*, *SEC v. Chicago Convention Ctr.*, 2013 WL 4012638, at *2-10 (N.D. Ill. Aug. 6, 2013) (analyzing whether Section 929P(b) effectively superseded *Morrison*). To repeat, this Court does not need to

Section 929P(b) does *not* apply retroactively to any pre-Dodd-Frank enactment[13] conduct, which makes up the bulk of the alleged conduct committed by Sunderlage in this case. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Under this presumption, "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Id.* (internal quotations and citations omitted).

Courts apply a two-part test to determine whether to enforce a statute retroactively. First, the court determines "whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. Section 929P(b), and the Dodd-Frank Act generally, does not mention retroactive enforcement. *See* Pub. L. No. 111-203. Other courts agree. *See, e.g., Koch v. SEC*, 793 F.3d 147, 158 (D.C. Cir. 2015); *Jones v. Southpeac Interactive Corp.*, 2013 WL 1155577, at *7 (E.D. Va. Mar. 19, 2013). So there is no definitive statutory command to satisfy the first part of the retroactivity test.

Because Congress failed to "make its intention clear," the court next considers whether retroactivity "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 268, 280. Applying the Dodd-Frank Act retroactively would expand Sunderlage's potential liability because

---

decide this issue because, as explained below, Section 929P(b) does not apply retroactively in any event.

[13]Congress passed the Dodd-Frank Act on July 21, 2010.

Section 929P(b) expanded the scope of fraudulent conduct that is subject to U.S. securities laws (again, assuming that Section 929P(b) overruled *Morrison*). Whereas *Morrison* limited the reach of the Exchange Act to *domestic* transactions, Section 929P(b)—which is entitled, "*Extraterritorial* Jurisdiction of the Antifraud Provisions of the Federal Securities Laws" (emphasis added)—ostensibly reinstated the more expansive conduct-and-effects test. *See Morrison*, 561 U.S. at 255-56 (observing that the conduct and effects test led to "the application of the Exchange Act … to fraudulent schemes that involve conduct and effects abroad," and limiting application of the Exchange Act to "domestic transactions"). Because Section 929P(b) expands the scope of liability for Sunderlage's past conduct, the general presumption against retroactivity kicks in, and the Court will not apply the provision retroactively. *See SEC v. Tourre*, 2013 WL 2407172, at *1 n.4 (S.D.N.Y. June 4, 2013) ("Because the Dodd-Frank Act effectively reversed *Morrison* in the context of SEC enforcement actions, the primary holdings of this opinion *affect only pre-Dodd Frank conduct*." (emphasis added)).

### b. Domestic Transactions Under *Morrison*

With *Morrison* as the governing case, now the question is whether the transactions at issue were domestic. *Morrison* held that Section 10(b) of the Exchange Act[14] only applies to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. at 267. The SEC does not contend that the securities at issue were listed on domestic exchanges, so

---

[14]*Morrison* also applies to Section 15 of the Exchange Act. *See SEC v. Benger*, 934 F. Supp. 2d 1008, 1013 (N.D. Ill. 2013).

the only question is whether the Employer Plans and Maven Life annuity constitute "domestic transactions in other securities." *Id.*

"[T]ransactions involving securities that are not [listed] on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012); *see also SEC v. Benger*, 2013 WL 593952, at *9 (N.D. Ill. Feb. 15, 2013) (citing *Absolute Activist*); *SEC v. Chicago Convention Ctr.*, LLC, 961 F. Supp. 2d 905, 917 (N.D. Ill. 2013) (same). Irrevocable liability is determined based on "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 70.

In *United States v. Vilar*, for example, the Second Circuit held that the defendants engaged in fraud in connection with a domestic purchase or sale of securities after analyzing the formation of the parties' contracts and exchange of money. 729 F.3d 62, 76-78 (2d Cir. 2013). The court held that irrevocable liability occurred in the United States because (1) the defendant and the victim met to discuss the investment in Puerto Rico (which counts fully as within the United States for these purposes); (2) the victim committed to the investment in Puerto Rico; (2) the defendant sent information about the investment to the victim's Puerto Rico address; (3) the victim was in Puerto Rico when she re-invested in the defendant's scheme; and (4) another victim was in New York when she received and signed commitment forms for the securities transaction and sent the money required for consummating the transaction. *Id.* Because the victims irrevocably

committed themselves to the transaction when they were in the United States, the Second Circuit concluded that the transactions were domestic. *Id.* at 78; *see also Absolute Activist*, 677 F.3d at 68 (a domestic transaction occurs when "the purchaser [has] incurred irrevocable liability within the United States to take and pay for a security, *or* … the seller [has] incurred irrevocable liability within the United States to deliver a security" (emphasis added)).

Like the victims in *Vilar*, at least some purchasers of the Employer Plans and Maven Life variable annuity also incurred irrevocable liability in the United States. American citizens purchased the Employer Plans and Maven Life variable annuity, *see* PSOF ¶¶ 27, 56, 69, and at least one committed to Sunderlage's investment scheme in the United States: Ken Voigt discussed and committed to investing in a Maven Assurance variable annuity in Illinois. *Id.* ¶¶ 70, 71; Exh. 11 ¶¶ 4-6, 9.

Moreover, like the victims in *Vilar*, investors in the Single-Employer Plan renewed their policies in the United States. The Living Benefits Policy underlying the Plan had a one-year term that participants renewed by simply "paying the premium due" within 30 days. R. 137-10 (Exh. 9 at GRATTIDGE-118, GRATTIDGE-124). U.S. investors therefore could re-invest in PIWM-I securities by sending premium payments to PBT, the Plan's administrator, in Illinois. *See* PSOF ¶ 20.

In response, Sunderlage relies too much on the Maven Assurance Subscription Agreement to argue that the parties incurred irrevocable liability in the Bahamas. *See* Def.'s Resp. Br. at 11-13; DSOF ¶ 18; R. 126-5 at 39 (Exh. 52 at

FSEC 505). First, the Second Circuit in *Absolute Activist* listed "the formation of the contracts" as just one of the factors to consider when determining where irrevocable liability occurred. 677 F.3d at 70. Other factors to consider include "the placement of purchase orders, the passing of title, or the exchange of money." *Id.* Second, while the Subscription Agreement might help establish that *Maven Assurance* incurred irrevocable liability in the Bahamas, it is silent as to where *investors* incurred irrevocable liability. *See* Exh. 52 at FSEC 505 ("[Maven Assurance] shall have the right to accept or reject this Subscription Agreement for any reason whatsoever, including but not limited to, the belief that the Subscriber is not suitable as a purchaser of the Preferred Stock, upon which the Company shall reject this Subscription Agreement and the Purchase Price shall be returned to the Subscriber."). The "domestic transaction" analysis looks at where "the purchaser incurred irrevocable liability within the United States to take and pay for a security, *or* … the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist*, 677 F.3d at 68 (emphasis added); *see also SEC v. Benger*, 2013 WL 593952, at *12 (N.D. Ill. Feb. 15, 2013) ("The evidence shows that in fact the sale was consummated in Brazil—where IBI became irrevocably bound—*or, perhaps, in the investors' home countries where they received their stock certificates*." (emphasis added)). Given that at least some investors incurred irrevocable liability in the United States, the transactions at issue were "domestic transactions" under *Morrison*, and Section 15 applies.

## 2. Acted As or Associated With a Broker

The final disputed element on Section 15 liability is whether Sunderlage acted as or associated with a broker. As noted earlier, Section 15 requires that brokers register with the SEC and prohibits any person who has been barred from associating with a broker to willfully "associate[] with a broker" without the SEC's consent. *See* 15 U.S.C. §§ 78o(a)(1), 78o(b)(6)(B)(i). The phrase "associated with a broker" refers to "any partner, officer, director … of [a] broker or dealer (or any person occupying a similar status or performing similar functions), [or] any person directly or indirectly controlling … such broker … ." 15 U.S.C. § 78c(a)(21). Even viewing the evidence in the light most favorable to Sunderlage, a reasonable trier of fact must conclude that Sunderlage acted as, and associated with, a broker.

Section 15 defines a "broker" as "any person engaged in the business of effectuating transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). The alleged broker must have had "a certain regularity of participation in securities transactions at key points in the chain of distribution." *SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984). Courts in this district look at a number of factors when analyzing whether an individual associated with a broker, including: whether the individual (1) solicited investors; (2) gave investment advice; (3) collected investor funds; (4) processed documents relating to the sale of securities; and (5) received commissions for the sale of securities. *SEC v. Benger*, 697 F. Supp. 2d 932, 944-45 (N.D. Ill. 2010); *SEC v. Randy*, 38 F. Supp. 2d 657, 668

(N.D. Ill. 1999). This list is by no means exhaustive;[15] rather, the inquiry focuses on whether the alleged broker "facilitated the consummation of [securities] sales." *Benger*, 697 F. Supp. 2d at 945.

For example, in *SEC v. Randy*, after analyzing the relevant factors, the district court concluded that an insurance agent selling certificates of deposit was acting as a broker. 38 F. Supp. 2d at 668. First, the court observed that the alleged broker "offered and sold the certificates by contacting prospective investors, conducting seminars, and distributing promotional material regarding Canadian Trade Bank." *Id.* The court also observed that the alleged broker was "the sole contact[] for those wishing to invest in Canadian Trade Bank," and that "[w]hen an investor agreed to purchase the certificates of deposit, [the alleged broker] provided the investor with a purchase order form and in at least one instance assisted an investor in filling out the form." *Id.* Finally, the court found it persuasive that the alleged broker received nearly $25,000 in commissions for selling the certificates of deposit. *Id.* Based on these facts, the court held that the defendant acted as a broker, and as a result, granted the SEC's motion for summary judgment. *Id.*; *cf.*

---

[15]Other factors include: whether the individual (1) is an employee of the issuer; (2) is selling, or previously sold, the securities of other issuers; and (3) is involved in negotiations between the issuer and the investor. *Hansen*, 1984 WL 2413, at *10; *see also Benger*, 697 F. Supp. 2d at 944-45. These factors only provide more support that Sunderlage acted as a broker: First, although Sunderlage was not an employee of Maven Assurance or Maven Life, he did help create the Maven companies and the so-called "insurance products" they sold. PSOF ¶¶ 24, 25, 33, 42, 47, 53; Def.'s Resp. PSOF ¶¶ 24, 25, 33, 42, 47. Second, Sunderlage previously sold the securities of other issuers. *See id.* ¶ 4; Exh. 2 at 2 (finding that between 1980 and 1984, Sunderlage "offered and sole certain unregistered securities issued by Caprimex, Inc., a subsidiary of Caprimex Holdings S.A."). Finally, Sunderlage served as an intermediary between issuers—here, Maven Assurance and Maven Life—and investors. For example, Sunderlage facilitated Ken Voigt's investment in a Maven Life variable annuity. PSOF ¶ 56; Def.'s Resp. PSOF ¶ 56; Exh. 11 ¶ 4.

*Benger*, 697 F. Supp.2d at 945 (concluding that the SEC sufficiently alleged that the defendant acted as a broker where complaint stated that the defendant "received transaction-based compensation … , collected the investors' funds … , received and processed documents relating to the sale of the securities, … and sent the investors' their share certificates").

As in *Randy*, the facts here establish that Sunderlage and SRG International "actively sought to effect securities transactions on behalf of others," and received commissions for doing so. *Id.* at 668. Sunderlage sent newsletters to Maven Assurance and Maven Life clients that discussed "returns on policy reserves" and relayed Battoo's "current positions" on stocks, U.S. treasury bonds, and other investments. PSOF ¶ 60; Def.'s Resp. PSOF ¶ 60; R. 126-19 (Exh. 94 at 4-5). SRG International also disseminated promotional materials to investors and held numerous conferences both in the United States and offshore for current and potential investors.[16] PSOF ¶¶ 60, 61; Def.'s Resp. PSOF ¶¶ 60, 61; Exh. 57; Exh. 58; Exh. 61; R. 126-19 at 94 (Exh. 96); R. 126-20 at 1 (Exh. 98); R. 126-22 at 1 (Exh. 100); R. 126-22 at 40 (Exh. 101). At these conferences, Sunderlage and other SRG International representatives met privately with potential clients to discuss investment options. PSOF ¶ 64; Def.'s Resp. PSOF ¶ 64.

In response, Sunderlage points to disclaimers in these marketing materials, arguing that the disclaimers informed investors that he was not acting as a broker

---

[16]Sunderlage maintains that conferences marketing the Single-Employer Plan were held abroad. Def.'s Resp. PSOF ¶ 61. He acknowledges, however, that SRG International held conferences in Las Vegas, Nevada for existing clients and advisers. *Id.*; Exh. 57; Exh. 58.

and not providing investment advice. Def.'s Resp. Br. at 15; DSOF ¶ 27; Exh. 94 at 5. But boilerplate disclaimers denying the provision of investment advice cannot change reality when the marketing materials *in fact* provide investment advice, which the materials here did. *E.g.*, Exh. 94 at 4-5. Isolated disclaimers cannot operate as a shield to insulate individuals from liability under the securities laws. *See SEC v. Wall St. Transcript Corp.*, 454 F. Supp. 559, 565 (S.D.N.Y. 1978). Moreover, these disclaimers do not even appear on every document promoting the Employer Plans and Maven Life annuity. *See, e.g.*, Exh. 96; Exh. 101 at MESSETT-00054 (disclaimer only refers to tax advice, not investment advice).

In addition to soliciting investors and providing investment advice, Sunderlage and SRG International also processed documents and handled funds to effectuate securities transactions. SRG International had clients sign investment management agreements, which designated Sunderlage or SRG International as the client's investment adviser. PSOF ¶ 59; Exh. 64; Exh. 67 at 1; Exh. 69 at Acadia SEC 270. These agreements provided that Sunderlage and SRG International had absolute discretion to buy, sell or transfer securities for the benefit of an investor. *See, e.g.*, Exh. 67 ¶ 2. Pursuant to their authority under these documents, Sunderlage and SRG International handled investors' funds to facilitate investments. PSOF ¶¶ 67, 71; R. 126-11 at 10 (Exh. 82 at 419_80399); R. 126-23 at 81 (Exh. 117 at SEC-VOIGHT-176). Investors also executed forms providing SRG International with the Power of Attorney. PSOF ¶ 65; Exh. 36; Exh. 37. The Power of Attorney gave SRG International full authority to execute documents and

securities transactions for an investor. PSOF ¶ 65; Def.'s Resp. PSOF ¶ 65; Exh. 36; Exh. 37.

Finally, Sunderlage and SRG International received transaction-based compensation for investments in the Employer Plans and the Maven Life variable annuity. SRG International had marketing agreements with both Maven Assurance and Maven Life that entitled SRG International to a commission and an annual trail fee for every Employer Plan and annuity sold by an SRG International adviser. PSOF ¶¶ 75, 76, 82; Exh. 53 at SUB000552; Exh. 42 at SUB000560; Exh. 77 at JL 66; Exh. 76 at JL 50. Sunderlage generated a portion of the transaction-based compensation that SRG International received. PSOF ¶ 86; Def.'s Resp. PSOF ¶ 86; R. 126-4 at 144 (Exh. 40). In fact, SRG International set aside "first year commissions and trail fees paid in regards to Tracy L. Sunderlage's personal block of business."[17] Exh. 40 at SIUS LLC 307.

In light of Sunderlage's multi-faceted participation in effecting investments in the Employer Plans and Maven Life variable annuities, the Court concludes, even giving Sunderlage the advantage of all reasonable inferences, that not only did Sunderlage associate with a broker—that is, SRG International[18]—but Sunderlage

---

[17]Sunderlage's contention that "he did not receive compensation for any 'brokering' services, rather he was a salaried W-2 employee, compensated for providing administrative services as a manager for an insurance agency," is beside the point. First, it is enough that Sunderlage's companies received Sunderlage's transaction-based compensation. Second, while Sunderlage may have earned a W-2 salary from SRG International, this does not negate the fact that he also generated commissions and fees for his work as a broker.

[18]As discussed above, the undisputed facts establish that SRG International had "a certain regularity of participation in securities transactions at key points in the chain of distribution." *Hansen*, 1984 WL 2413, at *10. As the CEO and a director of SRG

also acted as a broker in violation of Section 15. No reasonable trier of fact could find otherwise.

### D. Count Eight (Investment Advisers Act of 1940)

Moving on to Count Eight, the SEC alleges that Sunderlage violated Section 203(f) of the Advisers Act, which prohibits any person who has been barred from associating with an investment adviser to willfully "associate[] with an investment adviser" without the SEC's consent. 15 U.S.C. § 80b-3(f). Because courts have not extended *Morrison* to the Advisers Act,[19] the only issue is whether Sunderlage acted as, or associated with, an investment adviser in violation of Section 203(f).

### 1. Acted As or Associated With an Investment Adviser

An "investment adviser" is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b-2(a)(11). Put another way, an investment adviser is someone who (1) provides advice or issues reports or analyses regarding securities;

International, Sunderlage undoubtedly "associated with" a broker in violation of the SEC's bar.

[19]*See, e.g.*, *SEC v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *9 n.10 (S.D.N.Y. Mar. 11, 2013) ("Neither the Supreme Court nor the Second Circuit has extended Morrison to the IAA, and the Court declines to do so here. In *Morrison*, the Supreme Court based its interpretation of § 10(b) on the fact that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. By contrast as demonstrated by its test and regulatory structure, the focus of the IAA is clearly on the investment adviser and its actions." (internal quotations, citations, and brackets omitted)), *modified on other grounds*, 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014). In any event, Sunderlage's alleged violations of the Advisers Act concern domestic conduct: Sunderlage resided in Illinois and Florida at all times and personally advised U.S.-based clients, PSOF ¶ 8; Sunderlage's companies operated out of Illinois, *id.* ¶¶ 10-14, 16-17, 19-20; and Sunderlage and SRG International solicited U.S. investors through marketing materials and conferences held in the United States. *See* PSOF ¶¶ 61, 63; Def.'s Resp. PSOF ¶¶ 61, 63; Exh. 57; Exh. 58; Exh. 94.

(2) is in the business of providing those services; and (3) provides the services for compensation. The phrase "associated with an investment advisor" refers to "any partner, officer, or director of such investment adviser (or any persons performing similar functions), or any persons directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser." 15 U.S.C. § 80b-2(a)(17). The evidence shows that Sunderlage acted as, and associated with, an investment adviser: Sunderlage and SRG International were in the business of providing investment advice and generated compensation for doing so.

First, by relaying information about the Maven securities, as well as managing clients' funds, Sunderlage and SRG International provided investment advice to their clients. Making investment recommendations and controlling clients' investments qualify as providing investment advice under the Advisers Act. *See, e.g.*, *U.S. v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995) ("Elliott and Melhorn clearly have provided investment advice to their customers, both by advising them in their choice among Elliott Enterprise investment vehicles and by controlling the investments underlying those investment vehicles."), *amended on other grounds*, 82 F.3d 989 (11th Cir. 1996); *Abrahamson v. Fleschner*, 568 F.2d 862, 870-72 (2d Cir. 1977) (observing that Congress premised Advisers Act on an SEC report that identified two types of investment advisers: (1) "those who merely made recommendations to their clients," and (2) "those with management power over their clients' funds"); *SEC v. Smith*, 1992 WL 67822, at *3 (N.D. Ill. Mar. 26, 1992).

As discussed above, *see supra* Section III.C.2 at 31-32, Sunderlage and SRG International provided investment advice via newsletters, brochures, and in-person conferences.[20] PSOF ¶¶ 60, 61; Def.'s Resp. PSOF ¶¶ 60, 61; Exh. 57; Exh. 58; Exh. 61; Exh. 94 at 4-5; Exh. 96; Exh. 98; Exh. 100; Exh. 101. Sunderlage and other SRG International representatives also met directly with investors to discuss investing in the Employer Plans and Maven Life annuity. PSOF ¶¶ 56, 64; Def.'s Resp. PSOF ¶¶ 56, 64; Exh. 11 ¶ 4. Further, Sunderlage and SRG International exercised management control over clients' funds—for example, by collecting client funds and forwarding the funds offshore to Maven Assurance. PSOF ¶ 67; Exh. 82 at 419_80399.

Second, Sunderlage and SRG International were "in the business" of providing investment advice and managing client investments. The in-the-business standard requires that the alleged investment advisor "provided advice on more than rare, isolated occasions." *Elliott*, 62 F.3d at 1310; *see also Zinn v. Parrish*, 644 F.2d 360, 374 (7th Cir. 1981) (reasoning that "isolated transactions with a client" was insufficient to meet the "business" standard). In *Elliott*, the Eleventh Circuit found that the defendants qualified as investment advisers because they regularly "held Elliott out to the public as a registered investment adviser." 62 F.3d at 1310.

Here too, Sunderlage and SRG International regularly held themselves out as investment advisers. SRG International touted Sunderlage as having "thirty plus years of experience" in "international advanced wealth strategies, … sophisticated

_____

[20]As already explained, the boilerplate disclaimers on these promotional materials disclaiming the provision of investment advice do not undercut the overwhelming evidence that establishes otherwise.

investment strategies, [and] alternative investments." PSOF ¶ 62, Exh. 41. SRG International likewise marketed itself as "[a] firm specializing in international wealth strategies." Exh. 98 at GRATTIDGE-00008. SRG International's client account forms and agreements designating Sunderlage and SRG International as a client's investment adviser or manager further establish that Sunderlage and SRG International were "in the business" of providing investment advice. PSOF ¶ 59; Exh. 64; Exh. 67 ¶ 2; Exh. 69 at Acadia SEC 270.

Finally, Sunderlage and SRG International provided investment advice in exchange for compensation. It is not necessary that the alleged investment adviser charge a separate fee for advisory services; rather, receipt of any compensation for investment advice is enough. *Elliott*, 62 F.3d at 1311. As explained above, *see supra* Section III.C.2 at 33, Sunderlage and SRG International generated and received substantial commissions and fees for providing investment advice. PSOF ¶¶ 75, 76, 82, 86; Exh. 40 at SIUS LLC 307; Exh. 53 at SUB000552; Exh. 42 at SUB000560; Exh. 77 at JL 66; Exh. 76 at JL 50. In fact, Sunderlage has admitted in a deposition in another case that "SRG International received 'commissions and trail fees' from Maven." *Mintjal v. Prof. Benefit Trust*, — F. Supp.3d —, 2015 WL 5721612, at *11 (N.D. Ill. Sept. 29, 2015). By routinely providing investment advice in exchange for compensation, a reasonable trier of fact must hold that Sunderlage and SRG International acted as an investment adviser within the meaning of the Adviser's Act.

## IV. Conclusion

For the reasons discussed, the SEC's motion for summary judgment, R. 125, is granted, and liability is established as to the three counts alleged against Sunderlage. The parties must now promptly address the issue of remedies. The Court encourages the parties to engage in settlement negotiations to resolve the entirety of the case, and short of that, at least to try to resolve the issue of remedies. At the next status hearing, if the parties have not made substantial progress in settlement talks, the Court will set a briefing schedule on remedies. The Court thanks recruited *pro bono* counsel, Daniel Shapiro and Patrick Smith of Katten Muchin Rosenman, for their excellent work in representing Sunderlage. Mr. Shapiro and Mr. Smith have obviously put in enormous time and effort in representing Sunderlage as part of the bar's finest tradition of *pro bono* service.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January **25**, 2016